BIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THERMOFLEX WAUKEGAN, LLC, an Illinois limited liability company, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 21 C 788 |
| v. | ) ) | Judge John Z. Lee |
| MITSUI SUMITOMO INSURANCE USA, INC., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Thermoflex Waukegan, LLC, purchased a number of insurance policies from Defendant Mitsui Sumitomo Insurance USA, Inc. related to its business operations. While those policies were in effect, a former worker sued Thermoflex, alleging that it had violated the Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 *et seq.*, by requiring him to scan his handprint to check in and out of work. Thermoflex, in turn, notified Mitsui of the lawsuit and requested that Mitsui defend Thermoflex and indemnify it for any damages arising from the suit. Mitsui responded that the insurance policies it issued to Thermoflex did not cover BIPA claims, and the instant suit followed.

Now Thermoflex and Mitsui have cross-moved for summary judgment as to whether Mitsui has a duty to defend and indemnify Thermoflex under certain commercial general liability policies, as well as excess and umbrella insurance

policies.[1] Because the Court concludes that at least one of the exclusions contained in the commercial general liability policies applies to the underlying claims, Mitsui's motion is granted as to these policies, and Thermoflex's cross-motion is denied as to these policies.

## I. Undisputed Facts

### A. The Underlying Litigation

Gregory Gates filed a class action lawsuit in Illinois state court against Thermoflex and a temporary employment agency. Def.'s Statement of Facts ("DSOF") ¶ 7, ECF No. 27. According to Gates, Thermoflex required him to scan his handprint each time he clocked in and out of work. *Id.* ¶ 11. Furthermore, Gates claims that Thermoflex transmitted his handprint data to a third party without his authorization. *Id.* ¶ 12. Gates also alleges that the company did not provide him with a publicly-available policy identifying its retention schedule or procedures for obtaining his consent and release. *Id.* ¶ 13. As a result, Gates contends, Thermoflex violated BIPA, the Illinois statute that regulates the collection, disclosure, retention, and destruction of biometric information by private entities. *Id.* ¶ 14; *see* 740 Ill. Comp. Stat. 14/15.

---

[1] With regard to the excess and umbrella insurance policies, the parties do not address these policies or the exclusions in them with sufficient depth for the Court to rule on the cross-motions. The Court will set a separate briefing schedule to provide the parties with an opportunity to address them in a more complete manner. Accordingly, the following discussion is limited to the commercial general liability policies.

**B.  Thermoflex's Commercial General Liability Policies**

Mitsui insures Thermoflex under a series of commercial general liability policies ("CGL Policies"). DSOF ¶ 15. In them, Mitsui agreed to "pay those sums that [Thermoflex] becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." *Id.* ¶ 16. The CGL Policies define "personal and advertising injury" as "injury . . . arising out of one or more of" certain enumerated offenses, including the "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." *Id.* ¶ 17. They also require Mitsui to defend Thermoflex when it is named in a suit seeking damages for such injuries. *Id.*

The CGL Policies contain three pertinent exclusions. The first, entitled "Access Or Disclosure Of Confidential Or Personal Information," states:

> This insurance does not apply to . . . "personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

*Id.* ¶ 18.

The second, entitled "Recording And Distribution Of Material Or Information In Violation Of Law," provides that coverage is excluded for:

> "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

3

> (1) The Telephone Consumer Protection Act (TCPA) [47 U.S.C. § 227 *et seq.*] including any amendment of or addition to such law;
>
> (2) The CAN-SPAM Act of 2003 [15 U.S.C. § 7701 *et seq.*], including any amendment of or addition to such law;
>
> (3) The Fair Credit Reporting Act (FCRA) [15 U.S.C. § 1681 *et seq.*], and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or
>
> (4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

*Id.* ¶ 19.

The third, "Employment-Related Practices," reads that the insurance does not apply to "[p]ersonal and advertising injury to . . . [a] person arising out of any":

> (a) [r]efusal to employ that person;
>
> (b) [t]ermination of that person's employment; or
>
> (c) [e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person . . . .

*Id.* ¶ 20.

The issue here is whether any of these exclusions precludes coverage for Gates's lawsuit.

4

## II. <u>Legal Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Evidence offered at summary judgment must be admissible to the same extent as at trial, at least if the opposing party objects, except that testimony can be presented in the form of affidavits or transcripts of sworn testimony rather than in person." *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017). On cross-motions for summary judgment, the court "view[s] the facts and draw[s] reasonable inferences in favor of 'the party against whom the motion at issue was made.'" *Woodring v. Jackson Cnty.*, 986 F.3d 979, 984 (7th Cir. 2021) (quoting *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)).

When seeking summary judgment, the moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (cleaned up); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III. Analysis

As a preliminary matter, the parties agree that Illinois law applies. *Compare* Def.'s Mem. Law Supp. Summ. J. ("Def.'s Mem.") at 7, ECF No. 28, *with* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem."), ECF No. 32. Furthermore, all facts relevant to the cross-motions for summary judgment are undisputed. *See generally* Pl.'s Statement Facts Resp. DSOF ("Pl.'s Resp. DSOF"), ECF No. 29; Def.'s Statement Facts Resp. Pl.'s Statement Additional Facts ("Def.'s Resp. PSOAF"), ECF No. 37; Pl.'s Statement Resp. Def.'s Statement Additional Facts ("Pl.'s Resp. DSOAF"). Accordingly, the Court turns to the question at hand, namely, whether the CGL Policies Mitsui issued to Thermoflex provide coverage for the defense of the Gates lawsuit and indemnification for any damages arising from it. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021) ("Under Illinois law, the interpretation of an insurance policy, like any other contract, is a question of law.").

To do so, the Court must interpret the language of the CGL Policies. "The goal in interpreting an insurance policy is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020) (cleaned up). Under Illinois law, "the burden is initially on the insured party to show that its losses are covered under the policy's coverage terms." *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021).

As between the issues of defense versus indemnity, the Court turns first to the former and asks whether Mitsui has a duty to defend Thermoflex in the underlying suit. This is so because "[a]n insurer's duty to defend its insured is much broader than its duty to indemnify." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992). And, as a corollary, "[b]ecause the duty to defend is broader than the duty to indemnify, if an insurer owes no duty to defend, it owes no duty to indemnify." *Metzger v. Country Mut. Ins. Co.*, 986 N.E.2d 756, 761 (Ill. App. Ct. 2013) (internal quotation marks omitted).

To "determine whether the insurer's duty to defend has arisen, the court must compare the allegations of the underlying complaint to the policy language." *Id.* "If the court determines that these allegations fall within, or potentially within, the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint." *Id.*

But, even then, the insurer can avoid coverage if it can establish that a policy exclusion applies. *Bradley Hotel*, 19 F.4th at 1006. Of course, "[a]n insurer can only refuse to defend if the allegations of the underlying complaint preclude any possibility of coverage." *Ill. Tool Works, Inc. v. Travelers Cas. & Sur. Co.*, 26 N.E.3d 421, 428 (Ill. App. Ct. 2015). But a single unequivocal exclusion is sufficient to show that an insurer does not have a duty to defend the insured. *See, e.g., Hartford Cas. Ins. Co. v. Dental USA, Inc.*, No. 13 C 7637, 2014 WL 2863164, at *4 (N.D. Ill. June 24, 2014) (applying Illinois law).

7

The Court also is mindful that, when interpreting the terms of a policy, provisions that limit coverage are construed in favor of the insured. *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1004 (Ill. 2010). This rule, however, only applies where the meaning of the exclusionary language is ambiguous. *See id.* Such "[a]mbiguity exists if the language of the policy is subject to more than one reasonable interpretation as applied to the dispute before the court." *Bradley Hotel*, 19 F.4th at 1006.

Here, it is uncontested that the claims Gates asserts in the underlying lawsuit allege "personal and advertising injury," which, in turn, triggers coverage. As a result, to avoid coverage, Mitsui must establish that at least one of the exclusions precludes its duty to defend.

As noted above, the exclusion in the CGL Policies entitled "Access Or Disclosure Of Confidential Or Personal Information" ("Access/Disclosure exclusion") states:

> This insurance does not apply to . . . [d]amages arising out of . . . any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

DSOF ¶ 18.

The first clause in this provision is unequivocal. "This insurance does not apply to . . . [d]amages arising out of . . . *any* access to or disclosure of any person's . . . personal information[.]" *Id.* (emphasis added). And the word "any" has a broad

8

meaning. *See, e.g., United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New International Dictionary 97 (1976))). Because the language in the exclusion is clear and unambiguous, the Court ascribes to it its plain and ordinary meaning. *See Sanders v. Ill. Union Ins. Co.*, 157 N.E.3d 463, 467 (Ill. 2019).

Thermoflex attempts to circumscribe the phrase "any access to or disclosure of any person's . . . confidential or personal information" by pointing to the words that follow the word "including" and invoking the interpretative canon of *ejusdem generis* ("of the same kind"). Under this doctrine, "general words are construed to embrace only objects similar in nature to those . . . specific words." 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction § 47:17 (7th ed. 2021). But this argument is unpersuasive for several reasons.

First, *ejusdem generis* does not apply when the language at issue is unambiguous. *See Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 353 (7th Cir. 2006) ("*Ejusdem generis* provides guidance on how to interpret language where the meaning is not plain."). Here, nothing is ambiguous about the phrase "*any* access to or disclosure of any person's . . . personal information."

Second, when items are introduced by the word "including," the list that follows is not exclusive. *See In re Schwartz*, 799 F.3d 760, 763 (7th Cir. 2015) ("If you tell your maid to iron your clothes, including your Bond Street tuxedo and its cummerbund, there is no implication that she is not to iron your other clothes."). In

9

other words, the term "'[i]nclude' is a word of illustration, not limitation." *Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998). Therefore, the words in the Access/Disclosure exclusion that appear after "including" cannot limit the scope of the preceding clause "any access to or disclosure of any person's . . . personal information."[2]

Third, "the interpretive canon of *ejusdem generis* . . . attribute[s] to the last item . . . the same characteristic of discreteness shared by all the preceding items." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). But the canon does not apply when the items "are not sufficiently similar to belong to one identifiable class." *Hugh v. Amalgamated Tr. & Sav. Bank*, 602 N.E.2d 33, 38 (Ill. App. Ct. 1992).

Here, the items that are listed have no readily identifiable common thread (at least, not in the way that Thermoflex ascribes). For example, the first items in the list, "patents," are publicly available information. 37 C.F.R. § 1.11 ("The specification, drawings, and all papers relating to the file of . . .[a] published application; a patent; or a statutory invention registration are open to inspection by the public . . . ."). By contrast, "credit card information" is not. *See, e.g.*, 815 Ill. Comp. Stat. 530/5(1)(C) (defining "nonpublic personal information" as including a person's credit card number). Indeed, even Thermoflex recognizes that the list includes at least three distinct types of information. *See* Pl.'s Mem. at 6 (describing the list as including

---

[2] Furthermore, it is worth noting that "[a]uthorities have traditionally agreed that . . . [*ejusdem generis*] does not apply to a general-specific sequence." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 203 (2012). "In all contexts other than the pattern of specific-to-general, the proper rule to invoke is the broad associated-words canon, not the narrow *ejusdem generis* canon." *Id.* at 205.

10

publicly available intellectual property, non-public proprietary information, and confidential personal information). As such, the items on the list are not sufficiently similar to belong to one identifiable class, thereby rendering *ejusdem generis* inapplicable.³ *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("A canon meaning literally 'of the same kind' has no application to provisions directed toward dissimilar subject matter.").

Nevertheless, say that the Court were to find the provision's language to be ambiguous and, thus, apply the interpretive canon of *noscitur a sociis*—a broader, more permissive variation of *ejusdem generis*. *See* Singer & Singer, *supra*, § 47.16 (*noscitur a sociis* "means literally 'it is known from its associates,' and means practically that a word may be defined by an accompanying word, and that, ordinarily, the coupling of words denotes an intention that they should be understood in the same general sense"); *United States v. Williams*, 553 U.S. 285, 294 (2008) (describing *noscitur a sociis* as "a commonsense canon . . . which counsels that a word is given more precise content by the neighboring words"); *Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). The only readily discernible resemblance here is that several of the items, such as trade

---

³     Thermoflex also argues that biometric identifier information "does not contain usable, potentially valuable information in the way that a patent, customer list, or non-public financial record does." Pl.'s Mem. at 6. But Thermoflex provides no evidence that this is so, particularly when the mass collection of such data by large technology companies for profit would seem to indicate otherwise. BIPA itself appears to recognize this possibility. *See* 740 Ill. Comp. Stat. 14/15(c) (prohibiting a private entity from selling, trading, or otherwise profiting from a person's biometric information).

secrets, processing methods, customer lists, financial information, credit card information, and health information, denote certain categories of information about which individual and companies have a heightened interest in keeping from third-parties or the public at large, whether for financial reasons or otherwise. The biometric data that BIPA protects certainly falls within this category.[4]

For its part, Thermoflex cites BIPA and contends that, because the statute differentiates between "biometric information" and other "confidential and sensitive information," *see* 740 Ill. Comp. Stat. 14/10, the phrase "a person's . . . confidential or personal information" in the exclusion cannot encompass a person's biometric information. Pl.'s Mem. at 6. But the Access/Disclosure exclusion not only applies to "confidential" information, but to an individual's "personal" information as well, and Thermoflex does not explain why biometric information would not constitute "personal" information as that term appears in the exclusion.

Furthermore, although BIPA provides that "biometric identifier" information does not include a person's health care-related information, it does not expressly exclude "biometric identifier" information from the definition of "confidential and

---

[4] Other courts in this district have applied *ejusdem generis* or *noscitur a sociis* to an identical or similar provision and have arrived at the opposite conclusion. *See, e.g., Am. Fam. Mut. Ins. Co. v. Caremel, Inc.*, No. 20 C 637, 2022 WL 79868, at *3 (N.D. Ill. Jan. 7, 2022); *Citizens Ins. Co. of Am. v. Thermoflex Waukegan, LLC*, No. 20-CV-05980, 2022 WL 602534, at *6–7 (N.D. Ill. Mar. 1, 2022). The *Caramel* court, applying *ejusdem generis*, held that biometric data is unlike "health information" or "financial information," but it did little to assess whether the enumerated items share a common attribute. 2022 WL 79868, at *3. In *Citizens*, the court applied *noscitur a sociis*, relying on its interpretation of BIPA to find that the exclusion did not unambiguously exclude coverage. 2022 WL 602534, at *7. For the reasons discussed herein, the Court respectfully disagrees.

sensitive information." *Id.* In fact, the opposite is true: "biometric information" and "biometric identifier" information fall squarely within BIPA's definition of "confidential and sensitive information"—that is, "personal information that can be used to uniquely identify an individual." *See* 740 Ill. Comp. Stat. 14/10. This is further borne out by Section 14/15(e), which describes biometric information as a type of "confidential and sensitive information." 740 Ill. Comp. Stat. 14/15(e) (requiring a private entity in possession of biometric information to safeguard it "in a manner that is the same as or more protective than the manner in which the private entity stores, transmits, and protects *other* confidential and sensitive information") (emphasis added). Certainly, if the Illinois legislature had wanted to exclude biometric information from the category of "confidential and sensitive information," it could easily have done so (just as it excluded health care information in the definition of "biometric identifier" information).

Finally, it is not at all clear whether and to what extent statutory definitions should bear on the present inquiry at all. As noted, when interpreting an insurance contract, the focus is on what the parties intended the words to mean at the time of the policy's execution, not how the Illinois legislature defines biometric information in BIPA. *See Scottsdale Ins.*, 972 F.3d at 919 ("The goal in interpreting an insurance policy is to ascertain and give effect to the intention of the parties, as expressed in the policy language.") (cleaned up); *Am. States Ins. Co. v. Cap. Assocs. of Jackson Cnty., Inc.*, 392 F.3d 939, 942 (7th Cir. 2005) ("But the question is not how the word 'privacy' was used in the debates that led to [the statute] . . . but what the word means

13

in this insurance policy."). For all of these reasons, Thermoflex's statutory arguments are unpersuasive.

The Court next turns to the allegations in the underlying litigation to determine whether they clearly fall within the Access/Disclosure exclusion. In the state-court case, Gates alleges a wide range of BIPA violations. BIPA provides an action for damages against a private entity if it "disclose[s], redisclose[s], or otherwise disseminate[s] a person's . . . biometric identifier or biometric information" without the person's consent. 740 Ill. Comp. Stat. 14/15(d)(1); *id.* 14/20. BIPA's definition of "biometric identifier" includes hand scans. *Id.* 14/10.[5] The legislative findings state that such data requires protection because:

> [b]iometrics . . . are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

*Id.* 14/5(c). The stated purpose of BIPA is to regulate the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information in order to protect public welfare, security, and safety. *Id.* 14/5(g).

Gates alleges, among other things, that Thermoflex owes damages for disclosing Gates's hand-scan information to an out-of-state, third-party vendor without Gates's consent. DSOF ¶ 12. Indeed, the Seventh Circuit has described the invasion of privacy as "personal and real," where, as here, a plaintiff alleges the full

---

[5] Additionally, BIPA's definition of "biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

14

panoply of BIPA violations. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020); *see id.* at 1155 (stating that biometric identifiers "are immutable, and once compromised, are compromised forever"). Simply put, the state-court litigation seeks damages arising out of a third-party's access to or Thermoflex's disclosure of Gates's personal information, placing it clearly within the scope of the exclusion.

Thermoflex also argues that any construction that excludes coverage for damages based on the access to or disclosure of biometric information would consume the coverage grant for "personal and advertising injury," making the coverage illusory. Pl.'s Mem. at 5; *see* Def.'s SOF ¶ 17. But this is an overstatement. A "policy need not provide coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory." *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 841 N.E.2d 78, 86 (Ill. App. Ct. 2005), *aff'd*, 860 N.E.2d 280 (Ill. 2006); *see Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1101 (7th Cir. 2003) (rejecting the argument that the limitations were so broad that the policy provided no tangible coverage and holding that, under Illinois law, coverage is not illusory merely because it is limited). Here, the CGL Policies define "personal and advertising injury" to cover a broad range of claims that do not fall within the scope of the exclusion. *See* Compl. Ex. 1, CGL Policies, § V, ¶ 14, ECF No. 1-1 (listing, among other things, false arrest, detention, imprisonment, malicious prosecution, and copyright and trade dress infringement). As a result, the exclusion at issue does not render coverage for "personal and advertising injury" meaningless.

15

Along these same lines, Thermoflex argues that the Court's construction of the Access/Disclosure exclusion would swallow completely any coverage the CGL Policies provide for lawsuits alleging "[p]ersonal and advertising injury . . . arising out of . . . [o]ral or written publication, in any manner, of material that violates a person's right of privacy." But this too is incorrect.

Under Illinois law, the right to privacy encompasses more than a person's right to the maintain the confidentiality of their personal information. Take, for example, a person's right not to be placed in a false light. Illinois law recognizes this as a privacy right:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 989 (Ill. 1989) (quoting Restatement (Second) of Torts § 652E (Am. L. Inst. 1977) (cleaned up).

Claims for false light invasion of privacy seek damages arising out of a publication of material that violates a person's right of privacy, and, therefore, would satisfy the definition of "personal and advertising injury" in the CGL Policies. Yet, such claims would not fall under the Access/Disclosure exclusion because they would not seek damages arising out of any access to or disclosure of any person's confidential or personal information. Therefore, contrary to Thermoflex's contention, the Court's construction of the Access/Disclosure exclusion would not render coverage illusory.

16

For all of these reasons, the Court holds that the Access/Disclosure provision in the CGL Policies precludes coverage of the Gates lawsuit.[6]

## IV. Conclusion

For the foregoing reasons, Defendant Mitsui's motion for summary judgment is granted as to the CGL Policies, and Plaintiff Thermoflex's motion for summary judgment is denied as to the CGL Policies.

**IT IS SO ORDERED.** ENTERED: 3/30/22

*[signature]*

**John Z. Lee
United States District Judge**

---

[6] Because the Court holds that the Access/Disclosure exclusion precludes coverage, the Court need not address whether the "Recording And Distribution Of Material Or Information In Violation Of Law" or "Employment-Related Practices" exclusion also applies.